## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **KEEFE COMMISSARY NETWORK, LLC.,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 4:20-cv-00176-SNLJ** |
| ) | |
| **BEAZLEY INSURANCE COMPANY, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter comes before the Court on plaintiff Keefe Commissary Network, LLC.'s motion to disqualify Lewis Rice, LLC. as counsel to defendant Beazley Insurance Company, Inc. (ECF #16). Having considered the matter carefully, this Court will **DENY** the motion.

## I. BACKGROUND

This case narrowly involves Keefe Commissary's claim that Beazley breached an insurance contract when it refused to pay out more than $3 million in covered "losses" resulting from Keefe Commissary's settlement of an underlying lawsuit. That underlying lawsuit involves a much broader, ongoing public corruption investigation in Mississippi. It is alleged that a former Mississippi Department of Corrections official was accepting bribes and kickbacks in exchange for valuable prison operations and services contracts worth millions of dollars. Keefe Commissary says it was inadvertently wrapped up in that scandal, and the resulting litigation, when it purchased certain business interests from a

person implicated in the corruption, including tainted contracts, without knowing of that person's involvement. Though proclaiming its innocence, Keefe Commissary says it ultimately agreed to settle the lawsuit against it "in light of the operational burden and financial costs associated with continuing to defend the lawsuit."

The motion before this Court seeks to disqualify the Saint Louis-based law firm of Lewis Rice, LLC. from representing Beazley. Keefe Commissary points to a disqualifying "concurrent conflict of interest," saying that it was an active client of Lewis Rice at the time Lewis Rice elected to also represent the adversarial interests of Beazley. Keefe Commissary says it brought the conflict to Lewis Rice's attention. But, Lewis Rice, in order to cure any conflict, purportedly dropped Keefe Commissary "like a hot potato to take on [the] apparently more lucrative representation [of Beazley]."

The timeline of events is largely undisputed, aside from minor squabbles. Keefe Commissary speculates that Lewis Rice began representing Beazley on or near February 21, 2020. At minimum, there is no dispute that representation began on February 24, 2020, when Lewis Rice's attorneys entered an appearance on Beazley's behalf in this case. (ECF #6, 7, 8). At the time, Lewis Rice had been representing another company, ICSolutions, in lobbying matters for a prison service contract in St. Louis County, though Keefe Commissary says that it and ICSolutions are one-and-the-same. Lewis Rice concedes that its representation of ICSolutions ended, at the earliest, on March 3, 2020, when representation "came to its natural conclusion" (ICSolutions retained its contract with St. Louis County). Based on these facts there is an undisputed overlap of a little

2

more than a week—perhaps longer, depending on when Lewis Rice formally accepted

Beazley as a client—where Lewis Rice represented both ICSolutions and Beazley.

The core dispute animating the motion to disqualify is whether ICSolution is, in

effect, Keefe Commissary, such that Lewis Rice undertook to represent both Keefe

Commissary and Beazley at the same time. The corporate structure is key. Alexander

Lee, who serves as general counsel to all involved companies for plaintiff, submits an

affidavit setting out the details as follows:

> 2. I am currently employed as the Executive Vice President, General
> Counsel, and Corporate Secretary for TKC Holdings, Inc. ("TKC"), a
> position I have held since 2018. I previously held the position of Vice
> President, General Counsel, and Corporate Secretary for TKC beginning in
> October 2016.
>
> 3. In my role with TKC, I also hold roles on behalf of TKC's subsidiary
> companies. For example, I serve as General Counsel and Corporate Secretary
> for Keefe Group, LLC ("Keefe Group"), a direct subsidiary of TKC; and as
> General Counsel and Corporate Secretary for Keefe Commissary Network,
> LLC ("Keefe Commissary") and Inmate Calling Solutions, LLC
> ("ICSolutions"), both subsidiaries of Keefe Group.
>
> 4. Immediately before becoming Vice President, General Counsel and
> Corporate Secretary at TKC, I was the Vice President, General Counsel, and
> Corporate Secretary of Centric Group, LLC ("Centric") and its subsidiaries,
> which included Keefe Commissary and ICSolutions, among others. In
> October 2016, the membership interests of Centric—which included Keefe
> Group, Keefe Commissary, and ICSolutions—were sold to TKC through a
> Membership Interest Purchase Agreement. At that time, I transitioned from
> my role at Centric to TKC.

(ECF #17-1). To summarize, TKC is the holding company of Keefe Group, which is the

parent company of ICS Solutions and Keefe Commissary. Further, Lee acts as general

counsel—and, thus, primary contact person—for TKC, Keefe Group, Keefe Commissary,

and ICSolutions.

Lee says that he understood Lewis Rice to be "representing Keefe Group and its subsidiaries, including ICSolutions." And, apparently, "TKC"—the holding company— "paid all Lewis Rice invoices" on behalf of ICSolutions. He then learned "[o]n February 21, 2020, [] that Lewis Rice intended to represent Beazley … in defense of [this] suit." Within a few days, Lee notified his attorney at Lewis Rice of a conflict concern. On March 5, 2020, Lee says he received a reply that Lewis Rice intended to terminate the attorney-client relationship despite what Lee believed "remain[ed] a live [lobbying] issue for Keefe Group and ICSolutions."

## II. STANDARD OF REVIEW

The decision whether to grant or deny a motion to disqualify counsel rests in the sound discretion of the trial court. *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1154 (8th Cir. 1999). But, "[b]ecause of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict scrutiny." *Macheca Transp. Co. v. Philadelphia Indem. Co*., 463 F.3d 827, 833 (8th Cir. 2006) (internal quotations omitted). "A party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." *Id*.

State ethical laws "provide the baseline" for determining whether disqualification is necessary. *Urbandale Best, LLC. v. R&R Real Estate Investors, LLC*., 2018 WL 10345479 at *3 (S.D. Iowa June 12, 2018). But, ultimately, [t]he ability of federal courts to regulate those who appear before them cannot be controlled by state law." *Pappas v. Philip Morris, Inc*., 915 F.3d 889, 895 (2d Cir. 2019). Accordingly, "disqualification

cases are governed by state and national ethical standards," to include the ABA Model

Rules of Professional Conduct, the ABA Model Code of Professional Responsibility,

state rules of ethical conduct, and the court's own local rules. *Horaist v. Doctor's Hosp.*

*of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001); *Engineered Prod. Co. v. Donaldson*

*Co.*, 290 F. Supp. 2d 974, 980 (N.D. Iowa 2003) (accord).

## III. ANALYSIS

The Court begins with Rule 1.7 of the ABA Model Rules of Professional Conduct

(Missouri's Rule 1.7 is basically identical), as it specifically addresses the parent-

subsidiary concern at play here.[1] ABA Rule 1.7 states:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client
> if the representation involves a concurrent conflict of interest. A concurrent
> conflict of interest exists if:
>
> > (1) the representation of one client will be directly adverse to another
> > client; or
> >
> > (2) there is a significant risk that the representation of one or more clients
> > will be materially limited by the lawyer's responsibilities to another
> > client, a former client or a third person or by a personal interest of the
> > lawyer.

---

[1] As the factual background might suggest, there is some contention whether ABA Rule 1.7 (applicable to current clients) or ABA Rule 1.9 (applicable to former clients) should apply. This Court finds little trouble concluding that it is ABA Rule 1.7—and Missouri Rule 4-1.7 by proxy. At the relevant conflict-creating moment, Lewis Rice represented both ICSolution (the possible client link to Keefe Commissary) and Beazley simultaneously. Those facts are set out in the Background section of this Order. Given the week-long overlap in representation, this case presents the problem of a "concurrent conflict of interest" pursuant to ABA Rule 1.7(a). That conflict cannot be cured, as Lewis Rice seemingly tried to do, by unilaterally terminating the attorney-client relationships days ***after*** the affected client raised concerns. Lewis Rice does not affect, for itself, the applicability of one ethical rule over another. *See, e.g, Altova GmbH v. Syncro Soft SRL*, 320 F.Supp.3d 314 (D. Mass. 2018) (firm could not drop current client, at the moment a conflict of interest arose, in order to avoid Rule 1.7); *accord El Camino Resources, Ltd. v. Huntington Nat. Bank*, 623 F.Supp.2d 863, 878 (W.D. Mich.2007).

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

MODEL RULE OF PROF'L CONDUCT R. 1.7 (Am. Bar Ass'n 2020); *see also* MO. R. PROF'L

CONDUCT 4-1.7.

Comment 34 of ABA Rule 1.7 addresses "organizational clients." It states:

A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. See Rule 1.13(a). Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate in an unrelated matter, **unless the circumstances are such that the affiliate should also be considered a client of the lawyer, there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates, <u>or</u> the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client**.

MODEL RULE OF PROF'L CONDUCT, R. 1.7 CMT. 34 (emphasis added).

Keefe Commissary focuses on the first disjunctive example, arguing the

circumstances in this case are such that it should be considered a client of Lewis Rice.

Indeed, Keefe Commissary is quick to remind this Court that it is "wholly owned" by

Keefe Group and also "integrated" into Keefe Group's operations, just as ICSolutions is.

Keefe Commissary emphasizes that the corporate family utilizes "consolidated financial

statements; shared ownership, management, business strategies, and targeted clients; and

shared corporate functions including human resources, payroll, and risk management

services, as well as integrated in-house legal counsel including a single general counsel,

Alexander Lee." Lee's affidavit further explains the tight-knit relationship:

> 9. Keefe Group, Keefe Commissary, and ICSolutions all have the same LLC Manager, Chief Executive Officer, Chief Financial Officer, Corporate Secretary, and Chairman. They share pooled resources performing unified human resources, legal, payroll, and risk management functions. I personally oversee litigation and all legal affairs on behalf of TKC, Keefe Group, Keefe Commissary, and ICSolutions.

> 10. The products and services offered by Keefe Group and its subsidiaries— including Keefe Commissary and ICSolutions—are complementary, so the companies do not compete with each other for customers or projects. In fact, the companies share sales people and account managers who sell the multiple lines of businesses from the disparate subsidiaries to State Departments of Corrections and local jails and other facilities.

> 11. Collectively, the Keefe Group subsidiaries are equipped to provide a full complement of products and services to correctional facilities. Often, multiple Keefe Group subsidiaries have contracts with the same correctional facility.

> 12. Keefe Group, Keefe Commissary, and ICSolutions—along with Keefe Group's other subsidiaries—employ a unified business strategy based on the complementary nature of the services and products offered by Keefe Group and its subsidiaries. They seek to maintain ongoing business relationships between each of the individual subsidiaries and their existing clients. They also seek to expand business relationships with current clients to involve additional Keefe Group subsidiaries, or to expand business relationships with prospective clients. Each of the Keefe Group subsidiaries account for the business interests of other Keefe Group subsidiaries in making their business decisions.

(ECF #17-1, pp. 2-3).

What Keefe Commissary attempts to invoke is the so-called "corporate affiliate

conflicts" doctrine, although the Eighth Circuit does not appear to have addressed it. That

doctrine, as applied in other circuits, looks generally to the "high degree of operational commonality" and "financial interdependen[cy]" between two companies in determining whether they are one-and-the-same for purposes of finding a representational conflict. *Dr. Falk Pharma GmbH v. GeneriCo, LLC*., 916 F.3d 975, 985 (Fed. Cir. 2019); *see also Trimble, Inc. v. PerDiemCo, LLC*., 802 Fed.Appx. 556, 559 (Fed. Cir. 2020); *GSI Commerce Solutions, Inc. v. Baby Center*, LLC., 618 F.3d 204, 211 (2d. Cir. 2010). No doubt, Keefe Commissary, Keefe Commissary ICSolutions, and Keefe Group are heavily interdependent.

However, this Court ultimately need not weigh in on the applicability of the corporate affiliate conflicts doctrine because the parties' contract controls under the Model Rules. "The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client." MODEL RULE OF PROF'L CONDUCT, R. 1.2 CMT. 6; *see also Mid-Continent Cas. Co. v. Daniel Clampett Powell & Cunningham, LLC*, 196 S.W.3d 595, 599 (Mo. App. S.D. 2006) (rejecting the notion that "belief in an attorney-client relationship" is sufficient). Often, when a firm is confronted with a corporate client, a representational disclaimer will be included in the parties' contract to clear any ambiguity about who the client really is. The ABA explains that "[t]he best solution to the problems that may arise by reason of clients' corporate affiliations is to have a clear understanding between lawyer and client, at the very start of the representation, as to which entity or entities in the corporate family are to be the lawyer's clients." Am. Bar Ass'n Comm. on Ethics & Prof'l Resp., Formal Opinion 95-390 (1995). Thus,

8

engagement letters with representational disclaimers have become almost "necessary in today's business world because so many companies are related in some way that law firms would have substantial conflict issues" without them. *Cliffs Sales Co. v. Am. S.S. Co.*, 2007 WL 2907323 at *3 (N.D. Ohio Oct. 4, 2007).

> The parties' Engagement Letter includes the following representational disclaimer:

> In this statement and in the engagement letter, ***the pronoun "you" means the person(s) or entity(ies) specifically identified in the engagement letter as our client(s)*** and ***does not include any other person or entity having any relationship or affiliation whatsoever with the person or entity identified as our client***.

(ECF #24-2, Ex. 1) (emphasis added). Despite Lewis Rice's claim that it represented only ICSolutions, it is arguable that the Engagement Letter was broad enough to encompass an attorney-client relationship with both Keefe Group and ICSolutions. For example, the Engagement Letter's pre-printed signature block was for "Keefe Group Company" that Lee himself amended, upon his signature, to read "Keefe Group LLC." The Engagement Letter also begins with saying "[w]e appreciate that you have selected Lewis Rice LLC to represent your interest regarding ICSolutions a subsidiary of Keefe Group Company," and the address block is addressed to Lee (in-house counsel for the entire corporate family) followed by "ICSolutions [care/of] Keefe Group Company." (ECF #24-2, Ex. 1). But, nowhere is Keefe Commissary—a different subsidiary of Keefe Group—expressly mentioned or tacitly embraced. Accordingly, the representational disclaimer applies to exclude Keefe Commissary as a client.

> There is only one possible wrinkle to that conclusion. Both parties agree that a representational disclaimer is controlling *unless* their post-agreement conduct—what the

parties refer to as "mission creep"—broadens the scope of representation. A survey of the law supports this view. In cases where a representational disclaimer was overridden, it was done because some post-agreement conduct expanded the attorney-client relationship. For example, in *Lennar Mare Island, LLC. v. Steadfast Ins. Co*., a disclaimer stated "we shall not be deemed to represent any of [the client's] parents, subsidiaries, or other affiliates unless we expressly agree in writing to do so." 105 F.Supp.3d 1100, 1114 (E.D. Cal. 2015). The disclaimer was overridden where "the behavior of [the law firm] implie[d] that all [] understood [it] was [representing] more than just [the named client]," including firm's post-agreement involvement in "the entire corporate family" to include advice on "company-wide accounting practices and companywide FCPA compliance," as well as direct representation in a fee dispute involving one of the client's subsidiaries. *Id*.

Similarly, in *GSI Commerce Solutions, Inc. v. BabyCenter, LLC.,* a disclaimer stated "[u]nless agreed to in writing or we specifically undertake such additional representation at your request, we represent only the client named in the engagement letter, and not its affiliates, subsidiaries, partners, joint venturers, employees, directors, officers, shareholders, members, owners, agencies, departments, or divisions." 644 F.Supp.2d 333, 335 (S.D. N.Y. 2009). The disclaimer was overridden where the client "periodically asked [firm] to provide legal advice relating to [its] subsidiaries and affiliates" and, in reality, "most of the work [firm] performed … was for [client's] operating companies rather than for [client] itself." *Id*.

Here, there is no post-agreement conduct—no so-called "mission creep"— identified by Keefe Commissary that would broaden the representational scope. At best,

10

Keefe Commissary points to the fact that it indirectly benefited from the lobbying work Lewis Rice undertook on ICSolution's behalf (their business models are synergized and jointly benefit when a municipality works with both as opposed to only one). But, there is no evidence that Lewis Rice ever directly or indirectly advised Keefe Commissary or produced any kind of work product on its behalf. Indirectly benefitting from another company's attorney-client relationship, alone, is insufficient. *See HLP Properties, LLC. v. Consolidated Edison Co. of New York, Inc*., 2014 WL 5285926 at *4 (S.D.N.Y. Oct. 16, 2014) (enforcing disclaimer despite close alignment of parent and subsidiary—sharing headquarters, finances, and personnel—where evidence did not establish that work done for parent was rendered "with the express purpose of [also] assisting [subsidiary], although [it] may have indirectly benefitted."). Therefore, the parties' representational disclaimer is undisturbed, clearly excludes an attorney-client relationship with Keefe Commissary, and will be enforced in holding that no attorney-client relationship has been established between Keefe Commissary and Lewis Rice.

## IV. CONCLUSION

The Court does not take lightly the matter of disqualification. Lewis Rice may well have been unclear about its representation as to ICSolutions and Keefe Group, but there are no facts to suggest it ever undertook to represent the interests of Keefe Commissary. The Engagement Letter's representational disclaimer controls, then, and excludes Keefe Commissary from being treated as a client to Lewis Rice. No conflict existed, and the motion to disqualify will be denied.

Accordingly,

Case: 4:20-cv-00176-SNLJ   Doc. #:  36   Filed: 08/12/20   Page: 12 of 12 PageID #: 570

**IT IS HEREBY ORDERED** that plaintiff Keefe Commissary Network, LLC.'s motion to disqualify (ECF #16) is **DENIED**.

So ordered this 12th day of August 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE